Good morning, everyone. We have four cases, two are submitted on the briefs. The first case that we'll hear this morning is Dabbs v. Shelter, 21-6169, and we'll hear from the appellant. Thank you, Your Honor. And good morning. May it please the Court, I'm James Skimica, and I represent the appellant, Joanna Dabbs. I will tell the Court that I would like to, or I'm going to try to, reserve three minutes for rebuttal at the end. This is a judgment that comes to the Court on a, it's a summary judgment appeal. The summary judgment order is erroneous for a number of reasons, and my primary goal is to convince the panel to reverse and send it back to the trial court for trial. But I also want to start by saying that because the basis for this insurance company's defense to the claim throughout has been their theory that Oklahoma law requires consideration of When the district court withdrew the first order where he followed that, and then the second order followed the Badeo standard instead, the entire defense that they had went away. What if the Oklahoma law doesn't require it but permits it? Sure. I believe that it's one of the factors that you would consider as a reasonably prudent insurer. And that's just what the insurer did, right? Well, no. This insurance company, that was the end all, be all. That was a dead stop for considering paying Mr. Calderon's claim, the $30,000 settlement offer. And I don't believe that the Badeo standard allows for that to be the one and only factor. Well, the insurer's just looking out for the insured's interest by looking at the multiple claimants, right? Because the first to present a claim to the insurer isn't necessarily the most damaged part. It's not necessarily the most valuable, but in this case, all of the information indicated that it was. The insurer's claim notes say that the two other potential claims were not as serious because on the day of the wreck, while Mr. Calderon had to be extracted from the vehicle and could not walk, had to be carried out, the other two potential claims were ambulatory. They walked over to check on Mrs. Dabbs to see if she was okay. And then on the following Monday, when they first talked to the shelter adjuster, both of them reported to her that their injuries were, basically, that they were sore. Well, counsel, you know in the insurance context that somebody walking away from the accident doesn't have much to do with what their claims might be or what the amount might be. Right, right. And I guess, I don't know, I guess it seems to me that if you're conceding that this is one of the factors, you know, what the other claims will be and generally what the amount might be, I don't quite understand how you can contend that shelters should have done, could not have, you know, been needing that information if it's one of the factors. And basically, they had none. In fact, hadn't they even asked the attorney for, not just, I'm sorry, what's the information about this particular individual, but he also had one of the other two claims. That's right. And he ignored their request. Well, he didn't ignore their request. He didn't give them the medical records for Sierra, though. I'm sorry? He didn't give them the medical records for Sierra, which is what the request was. Every indication in the claims file is that the lawyer's office was telling them they didn't have them yet. Now, I don't know if that's true or not, but on summary judgment, that doesn't matter. The point is, this lawyer represents two of the three claimants, and he's insisting they move forward on one of the claimants, and they've got a very limited pot of funds here. Yes. And yet, he represents one of the other claimants and is not providing any medical records on that claimant or giving them any further information. So, it just seems odd to me that you would say that this is a factor that the shelter can consider, but yet, they don't have the information at this point. And you gave them a very short timeline, five days, to respond. Well, let me talk about the short time frame for just a second. It's not as short as five days, because very early, I think it was the Tuesday after the wreck, Mr. Guerriere told the shelter adjuster that he was likely to make a $30,000 demand for Mr. Calderon's claim. So, she's got that in her head for 30 days, at least, before the first offer comes in. Was that in the motion, in the response to the motion for summary judgment? I'm sorry? Was your argument that you just told Judge Moritz in your response to the motion for summary judgment? Yes, it was. It wasn't an 11-day period. It was a 41-day period, because she had known immediately that there was an expectation for a $30,000 demand? I can't say that it's exactly 41 days, but yes, that's the argument, is that she knew for much longer than the 11 or five days. Okay. But it's not a case where the insurer is dilatory. The offer for settlement is made in less than a month and a half from the accident. Do you have any cases where there's that speedy of an offer and yet there's bad faith? Well, Your Honor, the cases that would hold that that's not bad faith are cases where the information about the claim that's at issue was withheld. And that's the MCASCO case, I think, and the cases that it talks about. And MCASCO talks about the Bollinger factors, and all of those things are different factors. But the point here is that Oklahoma establishes the standard for an insurance carrier dealing with a settlement offer on a third-party liability claim. And the insurance company is charged with knowledge of the law. Here, they adjusted this claim in Texas. They didn't follow Texas law because they were- Correctly, in your view. Exactly, in my view. Contrary to what the Texas lawyer said. No, the Texas lawyer advised- That Texas law applies. The Texas lawyer didn't say necessarily that Texas law applies, but it wasn't in anybody's mind at the time. Nobody, when they were adjusting that claim, ever thought, gave any consideration to Oklahoma law might apply. They were told that under the Texas Soriano decision, you were not to consider competing claims when evaluating a settlement offer. And yet, that's exactly what they did, despite being told. And of course, this brings me to the point of an insurer being charged with knowledge of what the law is. In the law, and that's the Willis v. Midland Risk case that's based on the Timmons case. And so, they didn't follow Texas law. They didn't know they were supposed to be following Oklahoma law. But Oklahoma has the standard that's set in the Badillo case. Badillo did not deal with multiple claimants, but it sets the standard based on previous case law that in considering a settlement offer in a liability policy, the insurance company is supposed to basically consider that they're on the hook for the whole claim. And- Well, let me ask you about that, because that language keeps coming up in the briefs. And I have my own view on what Badillo says, but it's not final. It might be wrong. And that is, when it uses that language, the insurer can't consider policy limits. What I understand that to mean is the insurer can't say, well, we don't have much at risk here. There's only $10,000 in coverage. And it looks like we might get a $0 verdict, or it might be a $1 million verdict. But we don't have to worry about that, because we only have $10,000. Let's roll the dice and see what happens. That's what I understand Badillo is saying. Well, but it also says that you're not supposed to consider, the insurance carrier's not supposed to consider the policy limits. But that's what I'm saying. It can't consider the policy limits in making that decision whether to roll the dice. But obviously, the policy limits are highly relevant. It's going to be considered in a different sense. But it can't consider the policy limits in deciding, well, if there's a big verdict, we're going to be okay, but our insurer, sure, bankruptcy shall follow, no problem. That's what I understand Badillo to say. Well, that's not the way the cases read from other jurisdictions that follow similar standards. And the issue is, are you going to accept a reasonable offer to settle this one claim, or are you going to subject your insurer to an excess verdict? Okay, so going with your approach, and you say, the insurer here had to pay Mr. Calderon's claim because he had a broken leg and he had to be extracted, which I didn't realize, if so. And so it writes the $30,000 check, and then it turns out that one of the women involved in the accident has serious, serious injuries, much more than $30,000, but would have settled for $30,000 because of the policy limits, and now is unable to do that. You would be second-guessing the insurer in that instance, wouldn't you? No. As long as the insurer can say that they settled that first claim in good faith, then it's okay, that's the standard. Meaning that it considered the liability of all three of the claimants. Yes. Okay. I mean, that's one of the factors that they could have considered in this case. And yet they didn't have what they needed to do so. Well, that brings me to my next point that I have to make in the next two minutes, and that is that at the end of the day, there were not three claims to this policy, there were only two. They acknowledged sometime after the September 26th deadline passed that Ms. Andrade had never responded to... That they didn't know. They didn't know that at the time, the relevant time period. They did know that at the time. Before the time of the offer? Before the September 15th. They knew there was going to be no claim by one of the three claimants? They knew that she had not made a claim yet. That's different. Well... That's different. The Texas lawyer told them that they didn't need to consider or worry about her because she hadn't actually made a claim, so she wasn't a claimant. And we didn't cite that until our reply brief because frankly, we overlooked that. But your reviews, DeNovo, you get to pull up the whole record and consider all of it. The other thing is, we... I want to say on Mr. Goyer's affidavit, there is a couple of things that Judge DeGiusti said he would exclude because it was rendering a medical opinion. One is at page, paragraph 17 of his affidavit, which is attached to plaintiff's response brief. Paragraph 17, he says, I told Sherry that Ms. Andrade was not seriously injured. He did that based on having called her. He's a personal injury lawyer. He interviewed her. He's entitled to... He's qualified to assess that injury based on the conversation with the client. He's looking to sign her up. So that's not really expressing a medical opinion that he's not qualified to make. The other one is... I'm sorry. Yeah, I'll let you grab that real quickly. All right. At the end of the day, there's only two claims. They didn't follow either Texas law or Oklahoma law, and this verdict, or this summary judgment motion order needs to be reversed. Okay. Thank you. Thank you, Mr. Skimka. We'll hear from the appellate. I'm not going to spill my water. I'm going to go back and get it. Okay. May it please the court, Ryan Delligans, Durbin, Larimore, and Bialik on behalf of the appellee shelter mutual. Judge DiGiusti, at the district court level, was absolutely correct in finding there was no breach of contract, no breach of the duty to defend, no breach of the duty to indemnify. Is your understanding that the breach of contract ruling is part of the appeal? It is not. As I understand, every issue circled back to reasonableness in this regard, and in the four or five complaints that the appellant makes, I believe that it's simply based and premised upon the duty of good faith. And that brings me to the second point that Judge DiGiusti was also correct in finding that the appellant has failed to meet its burden of Oklahoma law on the duty of good faith. Oklahoma law clearly applies here. This case is viewed through the lens of reasonableness at the time shelter was called upon to act. And what we have here is not a refusal to accept a settlement. It is a delayed acceptance. And that is a distinction that is very important here. When we look at Bedillo, the Bedillo case has been brought up, was a case of a refusal. It was a refusal of an adjuster named Clint Wallace. And the reason I know that, that was my first case to go to trial with Jerry Durbin and Mark Bialik on. And I indexed more depositions in that case than I want to remember. But in that case, you had a refusal of an adjuster when he was called upon to act for Mr. Bedillo to do something reasonable, which was let Mr. Bedillo give a statement. Let Mr. Bedillo help in his defense. And to Justice Phillips' point, there is a big difference in gambling with the insured's versus what happened here where you have three competing claimants. At the time you're called upon to act, you act within 45 days of the accident. You're making decisions where you're starved for information. You're starved for information because you have a lawyer that was handling the claimant's claim. But there was a lot of starving going on, which is to say Ms. Dabbs wasn't exactly well shelter. And what I'm getting at is we knew at the time of the accident or all the people involved that one of the people had a broken leg. And any checking would have shown that it wasn't just a minor fraction. He had a serious injury. $30,000 offer is conveyed. Did anybody from shelter get on the phone to Ms. Dabbs and say, well, here's your situation. It's a 30-60 policy because of Texas increases the limits a little bit. And you saw, you were there, you saw Mr. Calderon was the one who needed help getting away from the accident. He's offered $30,000. You need to be careful here, Ms. Dabbs, because he could end up with a big claim. Do you want to settle for the $30,000 and take your chances with the other two based on what you saw? Was there any of that sort of discussion for her? Yes, sir. Absolutely. On September the 23rd of 2011, Lionel and Joanna Dabbs were called by shelter. They were explained the policy limit situation and Mr. Gutierrez, that's the Texas lawyer's demands. They were also asked, Joanna, Mrs. Dabbs, what she wanted to do and she understood that they could file suit and get excess, in excess of $30,000. All of that was explained to Mrs. Dabbs, including the limited policy that we had at issue here that actually kicked up because it was a 25-50 policy. That was all explained to Mrs. Dabbs on September the 23rd of 2011, prior to the expiration of the extended, the second policy limits demand. If it was explained and she understood that one of the injured parties was in a different category as the other two, and not to say soft tissue isn't important and might end up being the biggest number, why in the world would she not have said, please settle with him for $30,000 ASAP? Well, I don't know what Mrs. Dabbs was thinking, but I know that there was also the known two other claimants out there, and one of which that we did not know. As this panel knows, injuries can come, they can go. You don't know all the complexities within 30 days, but what we do know is we had three injured people, three injured persons two days after this accident that all made claims to this minimal policy. I can assure you that if it wasn't Mr. Calderon that made the claim and there was another injured party that had a minor brain injury that didn't surface for 30 days that came after this policy, and there was only $15,000 left on it, say, and they said, well, we would have settled for that policy limits that you already gave away. Why didn't you consider our claim? Why did you race to the first person that came in here that made claims on this policy when that's not your duty? Your duty is to protect the insured, and that is the significance of what has happened here. Their duty is to protect the insured. Their duty is not to the claimant. And you have three claims against one policy and against an insured. That is the significance. But why don't you, why didn't you, Edwards, just say to Mr. Groyer, okay, well, you don't have your client's medical records. I don't understand why you can't, your client, I don't understand why you can't get a medical release from your own client, but in any event, Mr. Groyer, if you don't, if you're saying she wasn't really that badly hurt and you can't give us the medical records, and you're giving us still three more days from this conversation with Ms. Dabbs, then I want you to stipulate that she's not going to demand more than $10,000. And if somebody had just asked Mr. Groyer that, this issue, we would never be here. You'd never have been before Judge DiGiusti. That's a very good point you make. And the problem that you had, as this Court can see from the record in the de novo review, is it takes two folks to have a conversation. And when Mr. Groyer is not having that conversation and is not engaging in that way, even with a lawyer involved, Shelter hired a lawyer to help assist and to facilitate. Sherry Edwards presumably has access to email, and she can hit a send button, and if she had sent that email to Mr. Groyer and he never responded, again, Judge DiGiusti, this never would have seen the light of day. And I should be a little bit tighter on the facts, Judge Bacarach, but I believe the lawyer did in fact send to Mr. Groyer an email and a letter asking him to please respond. But it was not what you're saying, which is a stipulation of- Yeah, because the whole problem is the uncertainty of whether Mr. Sierra, Ms. Sierra, or Ms. Andrade- And then to further your point, sir, the other uncertainty is the other claimant that at that point in time was not represented. Remember, I have to go, the view of the law is you have to go back to what you knew at the time. And you have another third claimant against this policy, against Mrs. Dabbs, that is not $60,000 of that policy, and you have the third claimant setting out here, and who gets hurt and says, I would have settled for the $30,000. It's still- Well, I don't want to make it too complicated, but even a mediocre lawyer could also fix that problem by telling Mr. Groyer, look, if you're wanting us to exhaust the $60,000 or exhaust the $30,000 on the 30-60 policy, and Ms. Andrade, you're saying she's not Well, if we get a bad claim that's going to be in excess of the $60,000, Mr. Groyer, I assume you'll indemnify us for that. I don't know what Mr. Groyer would, I mean, he's going to say no, but I think then you have an absolute defense to Mr. Skimminger's bad faith claim. Right. The practical aspect of all of this is the defense to this bad faith case is the reason that we're discussing all of these issues, because it's so reasonable what Shelter did. When you circle back through the lens of reasonableness, you're looking at three claims on a policy, a 45-day time period where Shelter does, in fact, accept delayed by three days the policy limits offer. It's a delayed acceptance. It's what this court spoke to in Wade, and the reason we're here is the very reason that Wade cautioned against. The shield of an insurance policy is for the insured. That shield of that policy shouldn't be allowed to be a sword of a claimant, and that's what this court said, and that's what's being used here, and the court went on to quote the First Circuit in the game of cat and mouse on these policies that are small. When you have multiple claimants and they're rushing, and so what we find ourselves circling back to is Judge DiGiusti's order that under Oklahoma law, what applies here is it has to be more than mere negligence. It has to be more than negligence for a bad faith cause of action to move forward. That's the law in Oklahoma. It's been that way since Christian. It was solidified again by the Badillo case, and what we have here is a situation where Shelter had these competing claims, was called upon to act reasonably at the time, and did so, and for those reasons, I would ask the court to affirm Judge DiGiusti and to find that the conduct of Shelter was reasonable and enter judgment for Shelter. Thank you. Thank you, sir. Mr. Skibbe, I'm afraid that we used up your time. You tried to keep it, though. But it was very well presented, both sides briefs and in your oral arguments, so even though we didn't let you rebut.